# APPEAL NO. 25-10562

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

DEAVRIN SNEED,
*Plaintiff-Appellant,*

v.

CROWN EQUIPMENT CORPORATION,
*Defendant-Appellee*

---

Appeal from the United States District Court for the United
States District Court for the Northern District of Texas,
Dallas Division
(3:23-CV-00743-K)

---

# BRIEF OF APPELLANT

---

Respectfully Submitted,

By:/s/ *Sadat Montgomery*
Sadat Montgomery
Texas Bar No. 24079893
Deniz Kilic
Texas Bar No. 24114437
MONTGOMERY LAW, PLLC
7901 John W. Carpenter Fwy
Dallas, TX 75247
Phone: (214) 720-6090
Facsimile: (877) 669-8520
***Counsel for Plaintiff-Appellant***

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Appellant certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. **Deavrin Sneed, Plaintiff**

2. **Montgomery Law, PLLC**
   7901 John W. Carpenter Fwy
   Dallas, TX 75247
   Phone: (214) 720-6090
   Sadat Montgomery
   Deniz Kilic
   *Counsel for Plaintiff-Appellant*
   *Deavrin Sneed*

3. **Hartline Barger, LLP**
   8750 Central Expressway
   Dallas, Texas 75231 Pryce G.
   Tucker Drew Thomas
   *Counsel for Defendant- Appellee*
   *Crown Equipment Corporation*

4. **Schouest, Bamdas, Soshea,**
   **Benmaier Eastham, PLLC**
   956 Sherry Lane, 20th Floor
   Dallas, Texas 75225
   Pryce G. Tucker, Esq.
   *Counsel for Defendant-Appellee*
   *Crown Equipment Corporation*

5. **Nelson Mullins Riley &**
   **Scarborough, LLP**
   1222 Demonbreun St.
   Nashville, TN 37203
   Thomas J. Cullen, Jr., Esq.
   *Counsel for Defendant-Appellee*
   *Crown Equipment Corporation*

By:/s/ *Sadat Montgomery*
Sadat Montgomery
Texas Bar No. 2407989

## STATEMENT REGARDING ORAL ARGUMENT

The Plaintiff-Appellant, DEAVRIN SNEED, respectfully requests oral argument. This appeal involves critical issues concerning judicial recusal standards and their implications for due process, the exclusion of crucial expert testimony under Daubert in the context of strict product liability and negligence claims, the proper application of presumptions and rebuttal standards under Texas Civil Practice and Remedies Code § 82.008, and the nuanced distinctions between product liability, direct negligence, general/ordinary negligence, and liability based on contractual duties with exclusive and complete control of the instrumentality at issue. Oral argument will significantly assist the Court in resolving these intricate factual and legal disputes, each essential to a fair and thorough consideration of this matter.

## TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS**...................................................i

**STATEMENT REGARDING ORAL ARGUMENT**.......................................ii

**TABLE  OF CONTENTS**................................................................iii

**TABLE  OF AUTHORITIES**............................................................iv

**JURISDICTIONAL STATEMENT**......................................................vi

**STATEMENT OF ISSUES ON APPEAL**...............................................vii

**STATEMENT OF THE CASE** ...........................................................9

**A. PROCEDURAL HISTORY**…..........................................................10

**B. STATEMENT OF FACTS** ...........................................................17

**SUMMARY OF ARGUMENTS**..........................................................27

**ARGUMENT** ............................................................................30

**CONCLUSION** .........................................................................73

**SIGNATURE OF COUNSEL**…........................................................75

**CERTIFICATE OF SERVICE** ........................................................76

**CERTIFICATE OF COMPLIANCE** .................................................. 77

**TABLE OF AUTHORITIES**

**CASES**

*Ackermann v. Wyeth Pharms.,* 526 F.3d 203 (5th Cir. 2008)

*Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813 (1986)

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)

*Bristol-Myers Squibb Co. v. Hancock,* 321 S.W.3d 53 (Tex. App.—Texarkana 2009, pet. denied)

*Casey v. Toyota Motor Eng'g & Mfg. N. Am.,* 770 F.3d 322 (5th Cir. 2014)

*City of Keller v. Wilson,* 168 S.W.3d 802 (Tex. 2005)

*Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993)

*Exxon Mobil Corp. v. Hines,* 962 F.3d 136 (5th Cir. 2020)

*Ford Motor Co.* v. *Ledesma,* 242 S.W.3d 32 (Tex. 2007)

*Gen. Elec. Co. v. Joiner,* 522 U.S. 136 (1997)

*Gen. Motors Corp.* v. *Sanchez,* 997 S.W.2d 584 (Tex. 1999)

*Goodner v. Hyundai Motor Co.,* 650 F.3d 1034 (5th Cir. 2011)

*Hernandez v. Tokai Corp.,* 2 S.W.3d251 (Tex. 1999)

*Hodges v. Mack Trucks, Inc.,* 474 F.3d 188 (5th Cir. 2006)

*IHS Cedars Treatment Ctr. v. Mason,* 143 S.W.3d 794 (Tex. 2004)

*Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778 (Tex. 2001)

*Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847 (1988)

*Liteky v. United States,* 510 U.S. 540 (1994)

*Marshall* v. *Jerrico, Inc.,* 446 U.S. 238 (1980)

*Mathis v. Exxon Corp.,* 302 F.3d 448 (5th Cir. 2002)

*Moore v. Ashland Chem. Inc.,* 151 F.3d 269 (5th Cir. 1998) (en banc)

*Nabors Drilling U.S.A., Inc. v. Escoto,* 288 S.W.3d401 (Tex. 2009)

*Pipitone v. Biomatrix, Inc.,* 288 F.3d 239 (5th Cir. 2002)

*Scordill v. Louisville Ladder Grp.,* 2003 WL 22427981 (N.D. Tex. Oct. 24, 2003)

*Smith v. EMC Corp.,* 393 F.3d 590 (5th Cir. 2004)

*Tansy v. Dacomed Corp.,* 890 S.W.2d 676 (Tex. App.—Houston [14th Dist.] 1994, writ denied)

*United States v. Jordan,* 49 F.3d 152 (5th Cir. 1995)

*Viterbo v. Dow Chem. Co.,* 826 F.2d 420 (5th Cir. 1987)

*Watkins v. Telsmith, Inc.,* 121 F.3d 984 (5th Cir. 1997)

**STATUTES AND RULES**

28 U.S.C. § 455(a)

28U.S.C. § 1291

Fed. R. Civ. P. 56(a)

Fed. R. Evid. 702

Tex. Civ. Prac. & Rem. Code § 82.005  Tex. Civ. Prac. & Rem. Code § 82.008

**OTHER AUTHORITIES**

ANSI B56.1 (2016) Safety Standard for Low- and High-Lift Trucks

ANSI Bl 1.0 (2015) Safety of Machinery

OSHA Regulations and Department of Labor Bulletins

## **JURISDICTIONAL STATEMENT**

Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1291, as this appeal arises from a final judgment entered by the United States District Court for the Northern District of Texas, Dallas Division. The plaintiff- appellant timely filed a notice of appeal in accordance with Rule 4(a) of the Federal Rules of Appellate Procedure

## ISSUES PRESENTED ON APPEAL

**I.      RECUSAL, APPERANCE OF IMPARTIALITY, AND DUE PROCESS VIOLATIONS**

**II.     GRANTING OF SUMMARY JUDGMENT ON APPELLANTS PRODUCTS LIABILITY & NEGLIGENCE CLAIMS**

**III.    MISAPPLICATION OF TEXAS § 82.008 PRESUMPTION BURDEN OF PRODUCTION AND REBUTTAL EVIDENCE.**

**IV.     EXPERT EXCLUSION**

**V.      DENIAL OF LEAVE TO SUPPLEMENT APPELLANTS MSJ RESPONSE -**

## STATEMENT OF THE CASE





## A.     Procedural History

**1. Pleadings and Early Rulings.** Judge Kinkeade denied Crown's three successive Rule 12(b)(6) motions, each time holding the pleadings plausible under *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007). ROA.8. Three denials of Crown's Rule 12(b)(6) motions. Crown moved under Rule 12(b)(6) in May 2023; Judge Ed Kinkeade denied that motion on July 10, 2023. ROA.5-8. Plaintiff filed a First Amended Complaint on August 18, 2023, alleging design-defect, manufacturing-defect, failure-to-warn, negligent maintenance, negligent repairs, and ordinary negligence claims. ROA.6. Judge Kinkeade denied Crown's renewed motions to dismiss as moot on the amended pleadings. ROA.6. On February 7, 2024, Judge Kinkeade again denied Crown's renewed Rule 12(b)(6) motion, holding the pleadings "plausible". ROA.8.

**2. August 27-28, 2023, Recusal notice and unexplained withdrawal.** On August 27, 2023, the docket reflected: "Court Request for Recusal: Magistrate Judge David E. Horan recused pursuant to Special Order 3-346." The next day, the docket added: "Please Disregard—Entered in Error." ROA.6. The record contains no explanation for the recusal notice or its immediate withdrawal. ROA.6. Plaintiff did not consent to magistrate jurisdiction at any time. ROA.83.

10

**3. Discovery and Expert Designations.** Following Judge Kinkeade's denials of dismissal, discovery proceeded. On May 16, 2024, Plaintiff designated affirmative experts including Robert Bullen, P.E., J.D., and Jason Kerrigan, Ph.D. ROA.11, 405-410, 426-431.

**4.** On May 16, 2024, Plaintiff designated Robert Bullen, P.E., J.D. (B.S. Mechanical Engineering, University of Maryland 1993; J.D., William H. Bowen School of Law 2020); 30+ years' experience in mechanical design, machine guarding, industrial safety systems; ROA. 576-627, 938-967, 1747-1749. Expert Bullen applied ANSI B56.1-2016 and ANSI B11.0-2015 methodology to evaluate Crown's RC5535-35 forklift, identifying three safer alternative designs: (1) robust optical switch less sensitive to dust/debris; (2) automatic braking upon accelerator-sensor error; (3) redundant signal verification—all technologically feasible, economically practical, and consistent with accepted engineering standards at time of manufacture. ROA.576-627, 938-967, 1747-1749.

**5.** Plaintiff also designated Jason Kerrigan, Ph.D. (Ph.D. and M.E., Mechanical and Aerospace Engineering, University of Virginia; B.S., Integrated Science and Technology, James Madison University; Director, UVA Center for Applied Biomechanics—world's largest injury-biomechanics research center. ROA.11, 405-410, 426-431, 607-633, 1750-1754. Expert Kerrigan employed peer-reviewed methodology identical to his government and academic work: analyzed forklift's

11

mechanical configuration, BAAN diagnostic logs, 5,010-incident accident database, ROA.1596-1744, reviewed incident video, deposition testimony, medical records; applied validated biomechanical research on human postural equilibrium (Horak 2006; Hsiao & Robinovitch 1998) explaining involuntary balance reflexes caused Mr. Sneed's limb extension beyond operator compartment; and compared Crown's historical design practices and industry studies confirming doors previously offered by Crown would have prevented foreseeable hazard without impairing function. ROA.1037-1041, 1750-1754.

**6. Crown's Daubert and Dispositive Motions.** On July 15, 2024—the last day for dispositive filings—Crown filed: (1) motion for summary judgment; and (2) separate Daubert motions seeking to exclude Dr. Kerrigan and Mr. Bullen. (ROA.439-693, 479-693, 692-710, 812-1381, Crown's summary judgment brief was overlength relative to N.D. Tex. Local Rule 7.2(c) and filed without motion for leave. ROA.439-693, 479-693.

**7. Crown's motions were self-defeating**. Crown's summary-judgment exhibits included the following: Service manual showing Crown's control and maintenance obligations (Ex. B); operator's manual (Ex. C); warning labels omitting any reference to acceleration-sensor defects/hazards (Ex. D); testimony from Crown's expert Grisez acknowledging design choices carrying known risks, Ex. E, ROA.520-528, confirming Crown's knowledge of recurrent error codes, ROA.531-532, prior

similar incidents, ROA.529-530, failure to warn operators of breaking failures, unintended acceleration, and sensor defects, ROA.532-539; OSHA regulations violated by Crown (Ex. F), ROA.543-548; ASME/ANSI standards governing forklift safety (Exs. G-H), ROA.549-557; Department of Labor bulletins warning of forklift-acceleration hazards (Exs. I—J) ROA.559-566; and Plaintiffs expert analyses identifying sensor defects and feasible safer alternatives (Exs. M-N). ROA.576-605, 607-633.

**8.** On August 5, 2024, Plaintiff timely responded to Crown's motions, ROA.12-13, 917-1750, identifying multiple genuine disputes regarding incident mechanism, causation, design defects, expert reliability, inapplicability of §82.008, and feasible safer alternatives. ROA.917-937. Plaintiffs accompanying exhibits included: Expert Reports (Exs. A-B; ROA.939-998); Expert Depositions (Exs. C-D; ROA.999-1034); Crown Forklift-Incident Logs (Ex. E; ROA.1036-1039); and hundreds of similar incidents from 1988-2023 involving same model forklifts at Target facilities, each reporting unintended acceleration or brake failure injuries. (Ex. F; ROA.1041-1179.)

Accelerator Sensor Error: (CROWN:000003)
Work Order W657754 states "Inspected Directional Switches" in the Repair Action Code and includes in the Service Performed that after a "lengthy test drive, there was an "accelerator sensor error" when plugging from PUF [forks trailing] to FF [forks first] direction."

The accelerator sensor error does not have an Event Code assigned to it. The error is generated when both the RS [forks trailing] and FS [forks first] directional sensors are seeing a travel request at the same time.

ROA.533

**Subject Truck: S/N: 1A559567 Recorded Event History**
These event codes were recorded from the subject RC5500 truck during the September 8, 2023 inspection.

| Event | Code | Hours |
|---|---|---|
| E1.1 Last | 105* | 7276 |
| E1.2 Last -1 | 105* | 7276 |
| E1.3 Last -2 | 319 | 7275 |
| E1.4 Last -3 | 319 | 7273 |
| E1.5 Last -4 | 319 | 7272 |
| E1.6 Last -5 | 201 | 7272 |
| E1.7 Last -6 | 108 | 7272 |
| E1.8 Last -7 | 722 | 7272 |
| E1.9 Last -8 | 723 | 7272 |
| E1.10 Last -9 | 319 | 7270 |
| E1.11 Last -10 | 319 | 7269 |
| E1.12 Last -11 | 319 | 7268 |
| E1.13 Last -12 | 723 | 7267 |
| E1.14 Last -13 | 108 | 7267 |
| E1.15 Last -14 | 319 | 7263 |
| E1.16 Last -15 | 319 | 7263 |

*I understand the two 105 event codes were generated during the post-accident inspection on September 8, 2023.

Mr. Sneed testified that after the turn in the direction towards the impact zone, the truck accelerated towards the impact zone. Mr. Sneed testified that he looked down at the display and saw an error code. Error code 319. (Page 129/Lines 7-15). The last 319 Event Code logged was at hour meter reading 7275 hours.

ROA.531


**Subject Truck: S/N: 1A559567 Work Orders**

| Workorder: | Completed Date: | Meter: (Hour) | Service Request Description: | Repair Action Code | Service Performed: | Technician |
|---|---|---|---|---|---|---|
| W621737 | 2/21/2022 | 5430 | RC124059 – unit overheating | Troubleshoot-Diagnose Electrical Miscellaneous | RC124059 – moved unit to a safe work area. Removed covers and blew all the dirt and debris from the unit. Checked all the connections. Found plastic in the fan housing so I removed it. Tested unit to try and get it to over heat. Unable to get it to overheat. Wiped down unit and returned it to service. | Chris Pettibone |
| PM340075 | 3/16/2022 | 5545 | | Planned Maintenance | RC124059 – performed PM | Toby Morris |
| W625978 | 3/29/2022 | 5621 | RC124059 – no travel; low SOC | Evaluated Battery | Unit was towed into the shop for no travel. Keyed on unit and found message showing "LOW SOC". Tested battery voltage and found the battery was causing all issues. Towed unit to battery charging area and waited for the battery to be swapped. Test drove with new battery and unit is fully operational. | Toby Morris |
| W626093 | 3/30/2022 | 5623 | RC124059 – no travel | Repaired Switch | Unit was in shop for no travel showing error code. Keyed on unit and found code 109 rekey error. Inspected and found unit was in tow mode. Switched unit to drive mode and unit was still showing rekey error. Found the emergency disconnect button was pushed down by the cover. Corrected this issue and test drove. Unit is fully functional and back in service | Toby Morris |
| PM347092 | 6/10/2022 | 6040 | | Planned Maintenance | RC124059 – moved unit to a safe work area, removed covers, performed pm, installed covers, wiped down and returned unit to service. | Chris Pettibone |

ROA.529

Page 18                                                                      May 16, 2024

| Workorder: | Completed Date: | Meter: (Hour) | Service Request Description: | Repair Action Code | Service Performed: | Technician |
|---|---|---|---|---|---|---|
| W634838 | 6/10/2022 | 5623 | RC124059 – pm follow up | Removed, Repaired and Reinstalled Fork | RC124059 – the unit has a broken clasp on the right fork and stripped bolt in the driver's compartment. I drilled out the bolt in the driver's compartment. I used a new bolt from the fastener bin. …. I installed the fork back on the unit and installed the fork stop. I tested the unit. It operates properly. I wiped down the unit and returned to service. | Chris Pettibone |
| W638874 | 7/18/2022 | 6270 | RC124059 – battery connector issue | Removed, Tested and Replaced Battery Connector | RC124059 – moved unit to safe work area. Removed covers and inspected the connector. The positive cable won't click into place. I removed the fasteners and the connector came off in 2 pieces. I removed the cables from the connector. I installed the cable in the new connector. I fastened down the connector. I tested the unit. It operates properly. I installed the covers, wiped down and returned unit to service. | Chris Pettibone |
| W643335 | 8/29/2022 | 6464 | RC124059 – no red tag | Removed, Tested and Replaced Steer Tires | Unit was in shop with no red tag. Test drove and found steer tires had failed. Placed unit on blocks and removed steer tires. Installed new and regreased bearings. While changing the tires, code 319 appeared. Began troubleshooting and found the RPS1 was out of adjustment. Readjusted and calibrated and the unit was still coding out. Removed and replaced RPS1 and brake switch. Set to spec and cali[b]rated. Test drove, wiped down unit, and returned to service. | Toby Morris |
| PM355195 | 9/27/2022 | 6464 | | | RC124059 – pm denied, unit was removed from the shop by customer or operator | Toby Morris |
| PM361793 | 12/9/2022 | 7165 | | Planned Maintenance | Unit was in shop for pm. Performed visual inspection and test drive. Setup cohe and removed covers. Blew off unit. Lubed and greased all moving parts. Broken bolt on operator compartment. Remo[v]ed broken bolt. All chains were out of adjustment. Adjusted all chains to correct specs. Reinstalled covers and cleaned unit. Performed final test drive and returned to service. | Micah Walker |
| W657754 | 1/3/2023 | 7276 | RC124059 ~ involved in accident | Inspected Directional Switches | Drove to customers location to thoroughly inspect this unit that was involved in an accident. The operator struck a pole causing injury to his left ankle. After completing visual inspection, I began the test drive. Initially found no issues, however after a lengthy test drive, there was an "accelerator sensor error" when plugging from PUF to FF direction. Unit is currently down, wrapped in caution tape, and locked out tagged out. Currently waiting on further instructions from pending investigation. Unit is currently under investigation. | Toby Morris |

ROA.530

**9**. **Apparent Professional Connection and Recusal Concerns**.  Public records show that Magistrate Judge Horan was a former partner at Jones Day. During his tenure, attorney David Jones was also a Jones Day partner. In 2024, David Jones joined Hartline Barger LLP—the firm representing Crown in this case. This chronology corresponds to the August 27 recusal notice and subsequent withdrawal. Despite the conflict, the Magistrate Judge did not disclose the relationship. All post-recusal rulings were entered in Defendant Crown's favor represented by Hartline Barger, after what an initial attempt to recuse by Magistrate Judge Horan on August 27-28, 2023. ROA.6.



(**Fig. 1**: Partner of Hartline Barger–Former Partner of Magistrate Horan)[1]

---

[1] See https://www.linkedin.com/posts/hartline-barger_congratulations-to-hartline-barger-attorney-activity-



(**Figure 2** – Professional Biography of Magistrate Judge David L. Horan)[2]

**10. Procedural Contrast and Appeal.** Judge Kinkeade—reviewing the same or less evidence—had denied Crown's dispositive motions three times. Under Magistrate Horan, Defendant Crown prevailed on every contested motion. Plaintiff filed timely objections (Docs. 113-115; ROA.2631-5250), which the district court overruled (ROA.5251-52). Notice of appeal followed. ROA.5253-54.

**B.      Statement of Facts**

**a)      *The Catastrophic Incident (12/20/2022)***

**11.**     On December 20, 2022, Mr. Sneed reported for his shift in Target's de-pal area. (ROA.3255-3256) Fifteen minutes into his shift, while traveling at 3-3.5 mph and attempting standard "plugging" to slow down, the forklift suddenly

---

[2] 7087112264389967873-PdMF (announcing David Jones joining Hartline Barger as partner in 2024). See https://www.txnd.uscourts.gov/judge/magistrate-judge-david-horan  (biographical information showing Jones Day partnership)

malfunctioned and accelerated uncontrollably toward a stationary bollard. ROA.3263-3264, 3270, 512-514.

12.    As Mr. Sneed initiated a routine turn, the truck surged unexpectedly, a beep sounded, and the display showed "ROR: 319"—an error code Mr. Sneed had never seen. (ROA.3272.) He attempted to slow by plugging, but "when I changed direction, that's when I noticed the speed change—it actually sped up." ROA.3273-3275. He raised his foot to apply the mechanical brake, but "it did not decelerate... it continued to accelerate toward the impact zone." ROA.3275-3276, 512-514. Mr. Sneed succinctly testified: "Straight, plug, turn, acceleration, error code, impact." ROA.517-521, 3278.

13.    Mr. Sneed's forklift training emphasized "plugging" (preferred procedure) and "braking" (emergency measure). ROA.2724-2745, 3215-3235. Despite immediate attempts at both, the forklift failed to respond due to documented mechanical malfunction (Error 319). ROA.2826-2830, 3141-3355, 3251-3271. Seeing trajectory align toward his trainer, Mr. Sneed steered for a fixed yellow bollard "because the pole is supposed to stop the equipment," but "it was going faster than before," culminating in impact. ROA.3267-3268, 3284-3285.

14.    Upon impact, the bollard dislodged and crushed Mr. Sneed's left lower extremity, trapping his foot beneath the forklift and causing severe trauma and bleeding.  ROA.2812-818,  ROA.3147-3355,  Ex.  10-13.  Target's  internal

investigation classified the event as OSHA-recordable, amputation-level incident. Emergency physicians noted severe crush injuries and open comminuted fracture through talar neck. Urgent surgical intervention included multiplanar external fixation, wound debridement, and ligament reconstruction. Mr. Sneed lost circulation distal to injury within hours post-surgery. On January 9, 2023, Mr. Sneed underwent traumatic left below-the-knee amputation. ROA.3307.

15. Mr. Sneed now endures chronic pain, debilitating anxiety, severe depression, insomnia, and PTSD, each medically documented by treating physicians. The Day-in-the-Life Video illustrates the harm caused by Crown's negligence.

b) *Crown's Service Agreement and Contractual Duties*

16. On June 26, 2019, Target purchased Crown RC5535-35 Forklift Serial No. 1A559567 along with fifteen identical units. Under "Statement of Work, Target Distribution Rolling Stock Full Maintenance Plus Complete Maintenance" effective July 9, 2019, ROA.2701-2709, Crown assumed sole responsibility for ongoing inspection, maintenance, servicing, and repairs of Target's forklift fleet, including the unit involved in Mr. Sneed's injury. The Service Agreement mandated continuous maintenance at regular intervals, prompt notification of significant issues, and immediate resolution of malfunctions. ROA.2701-2709. Crown's Pre-Delivery Inspection Checklist requires comprehensive testing before release; Operator's Daily Checklist mandates removal of any truck "in any way unsafe" until

restored to safe condition. ROA.2710-2723, 2699-2700.

**c)** ***Crown's Exclusive Control & Operation of the BAAN Forklift Diagnostic System***

17. Crown installed its proprietary BAAN 24/7 Live Error Monitoring system on Serial No. 1A559567 at Target's Midlothian facility. ROA.2779-2780. BAAN continuously records error codes and fault conditions, allowing remote review of error history. ROA.779-2780, 2826-2830. Crown maintained onsite personnel tasked with actively monitoring the forklift's operational status through BAAN, providing Crown real-time knowledge of faults, malfunctions, and safety hazards, giving Crown means to detect and address developing accelerator-sensor and brake-sequence problems before Mr. Sneed's shift. ROA. 2779-2780, 2826-2830. Crown's failure to address known safety risks despite direct access to continuous BAAN alerts establishes liability for resulting injuries.

**d)** ***Crown's Negligent Supervision of Technician Micah Walker***

18. On December 9, 2022, Walker performed planned maintenance on Serial No. 1A559567, recording broken operator-compartment bolt, lift chains out of adjustment, worn drive tires, and front cover damage, then returned the unit to service after 2.87 hours. ROA. 2550-2552. Despite BAAN's availability, Walker's work order does not reflect any BAAN error-log download or review. ROA.2550, 2826-2830. The optical braking sensor became compromised by debris, triggering "319" sensor error. Crown's senior technician Morris confirmed

post-incident this exact malfunction was reproducible under conditions identical to Mr. Sneed's accident. ROA.2816-2826, 3926-4066.

19.     Plaintiff's expert Bullen confirmed Mr. Walker allowed the forklift back onto the floor without properly removing dust or debris, and the forklift's optical switch utilized when brakes are applied was covered in dust at the time of incident, compromising Mr. Sneed's ability to operate and stop the forklift. ROA.3695-3732. When asked about this, Crown technician testified he was "not sure what dust or debris had to do with the operation of the machine." ROA.3926-4066.

### e)      *Ten Months of Documented Warnings: Prior Work Orders and Error Codes Forklift - RC5535-35* (10)

20.     Maintenance records spanning ten months prior to Mr. Sneed's injury reveal repeated, unresolved malfunctions. Crown's error history shows recurring control/brake faults, including Code 319 events associated with traction/brake control sequence. ROA.512-541. Crown's documentation confirms "319" sensor error was activated approximately 255 times over the forklift's operational lifespan. ROA.220, 2826-2830, with 8 events between hour meters 7263-7275, with 7275 corresponding to accident window. ROA.221, 531, 2826-2830. Error code "723," another critical fault closely linked to sensor issues, was activated at least 66 times, underscoring dangerous pattern of systemic neglect. ROA.221, 531, 2826-2830.

21.     Crown's expert Grisez explained Code 319 is issued "if the RPS1 and BRKS brake inputs to the Access 3 Traction Control Module are not in proper sequence"

and that upon a 319 event "productive travel is removed and the RC5500 will be brought to a controlled stop." ROA.512-541. This contradicts Mr. Sneed's uncontroverted testimony that the truck continued to accelerate. ROA.3269-3270. Crown's specifications show that at 3 mph, maximum stopping distance should be 34 inches; Mr. Sneed had 120-180 inches available—over four times the required distance. ROA.525-529, 3264.

22.     From February 21, 2022, until eleven days prior to injury, Crown documented no fewer than ten separate work orders identifying serious mechanical deficiencies, ROA.529-530. Critical overheating due to debris accumulation, W621737, Feb. 21, 2022, ROA.529; battery failure impacting electrical stability, W625978, March 29, 2022; ROA.3001-3091; malfunctioning emergency disconnect button W626093, March 30, 2022; ROA.529, 3001-3091; structural defects including broken clasps and stripped bolts W634838, PM347092, June 10, 2022, ROA.529-530; battery connector defect W638874, July 18, 2022, ROA.530; critical sensor and brake malfunction explicitly tied to "319" error, W643335, August 29, 2022— Crown documented Code 319, found RPS1 "out of adjustment," replaced RPS1 and brake switch, yet unit "was still coding out", demonstrating Crown's knowledge of persistent defect yet failure to remove unit from service, ROA.530, premature termination of planned maintenance PM355195, Sept. 27, 2022, ROA.531; and broken bolts and lift-chain misalignment, PM361793, Dec. 9, 2022, ROA.530, 2550-

2552, 2812-2813.

### f)      *Post-Incident Inspections and Findings*

23.     Crown's post-incident investigation conducted by technician Toby Morris on December 21, 2022, confirmed the catastrophic malfunction. ROA.2697-2698, 2816-2818, 3926-4066. After lengthy test drive, technicians reproduced "accelerator sensor error" while plugging from PUF to FF direction, and the truck was locked/tagged out. ROA.2697-2698. This accelerator-sensor manifestation corroborates Mr. Sneed's description and shows the defect would not be detected by brief maintenance tests like the December 9 service. ROA.2697-2698, 2550-2552.

24.     Morris's accident report documented severe "Accelerator Sensor Error" precisely during the plugging maneuver. Rather than stopping as designed, forklift continued to coast, contradicting expected operational response. ROA.2816- 2818. Inspection revealed significant dust and debris on multi-function handle assembly and optical switches, ROA.2816-2818, contradicting Crown's December 9 claim that the unit was "cleaned and blown off." ROA.2550-2552, 2812-2813. Crown's post-incident testing confirmed this debris triggered intermittent accelerator errors consistent with Mr. Sneed's experience, preventing proper slowing during plugging. ROA 2816-2818.

25.     Investigation confirmed run-time of 7,276 hours with multiple error codes—including repeated "319" errors—in the moments leading up to and following

23

catastrophic injury. ROA.2826-2830. Chronological error code history shows: Code 105 at hour meter 7276; Code 319 at hour meters 7275, 7273, and 7272 (multiple occurrences immediately before incident); Codes 201, 108, 722, and 723 at hour meter 7272; and another Code 319 at hour meter 7270. ROA.2826-2830. These documented errors substantiate Crown's constructive knowledge and negligent failure to take corrective action. This evidence demonstrates clear malfunction of forklift's braking and sensor systems, directly causing catastrophic incident and underscoring dangerous mechanical defects at issue. Significantly, sensor error documented immediately after incident precisely mirrors Crown's longstanding history of persistent sensor malfunctions.

**26.**    Crown's own maintenance records—specifically, Work Order W643335 dated August 22, 2022—explicitly identified and detailed exact malfunction (Error RPS1:319) encountered during Mr. Sneed's incident. While Crown performed partial recalibration and component replacement, it failed to address underlying defect, which remained unresolved, foreseeably resulting in catastrophic equipment failure and directly causing Plaintiffs devastating injury. Crown's knowledge of this precise malfunction and subsequent insufficient corrective action amplify its liability, establishing clear direct and proximate causation and culpability. This detailed post-incident inspection and investigation confirms both known mechanical failure and Crown's longstanding awareness of defect. Repeated maintenance issues—including

consecutive occurrences of critical "319" error—demonstrates Crown's explicit knowledge and continuous disregard of forklift's dangerous condition. Rather than effectively addressing these documented problems, Crown repeatedly applied inadequate or superficial remedies, leaving hazardous condition unresolved.

27.    Walker—hired just 78 days before incident—openly admitted during deposition he lacked knowledge of critical maintenance requirements, such as removing dust and debris, explicitly outlined in Crown's internal manuals. ROA.3092-3122, 3926-4066. Walker's negligence and inadequate training directly contributed to malfunction by leaving critical optical braking sensors obstructed with debris, thus compromising Mr. Sneed's ability to safely stop forklift.

### g)    *Plaintiffs Experts Establish Defect, Causation, and Safer Alternatives*

28.    Plaintiff's expert Bullen attributes Mr. Sneed's injury to Crown's negligent maintenance, defective sensor choices, and repeated failures to service documented hazards. ROA.3695-3732. Bullen determined the forklift malfunctioned because dust and debris accumulated inside optical direction sensors, causing false signals and accelerator-sensor error during plugging. The design permitted the truck to coast freely rather than stop when this error occurred. ROA.1746, 3695-3702.

29.    Bullen identified feasible safer alternatives: (a) higher-ingress-protection optical switches; (b) reprogramming controller to command automatic braking upon accelerator-sensor error; and (c) integration of redundant braking circuits— each

would have prevented incident without impairing performance or increasing cost. ROA.1459-1461, 1741-1742, 3699-3706. Bullen found Crown violated ANSI Bl1.0 risk-assessment and ANSI/ITSDF B56.1 design-safety protocols. To reasonable engineering certainty, Bullen opined the RC5535-35 was defectively designed, unreasonably dangerous, negligently maintained, and that Crown's conduct demonstrated conscious disregard for operator safety. ROA.1743, 3695-3732.

30.    Plaintiff's biomechanical expert Dr. Jason Kerrigan, Director of UVA's Center for Applied Biomechanics, analyzed the incident using validated human-balance models, concluding that as Mr. Sneed lifted his left foot to brake, natural postural-equilibrium reflexes caused his leg to extend involuntarily outside open operator compartment where it was crushed. ROA.3900-3907. Drawing on neuromuscular-control research, he explained lifting one foot destabilizes standing operator's center of gravity; in a stand-up forklift requiring foot-lift to brake, the operator cannot widen stance to regain balance, causing lower extremity projection into the hazard zone. ROA.1037-1041, 3901-3905.

31.    Dr. Kerrigan identified safer, feasible designs including lightweight doors, back-rest pressure sensors, and reprogramming to require both feet on floor before motion. Laboratory testing showed such doors added only 0.05-0.09 seconds to egress—insufficient to affect emergency exit—and would have prevented Mr. Sneed's injury. ROA.3909-3911, 1746-1748. Analyzing Crown's 5,010-accident

database, Kerrigan found left-lower-extremity crush injuries were more than 20 times more frequent than fatal tip-over incidents (622 cases vs. 29). Crown's open-compartment design addressed only ~1% of hazards while ignoring dominant injury mode. ROA.3912-3915. To reasonable biomechanical certainty, Dr. Kerrigan opined open-operator-compartment design was unreasonably dangerous and safer alternatives were technologically and economically feasible. ROA.3911-3924, 1744-1748.

**h)**     *Crown's Knowledge of Forklift's Defect/Danger and Failure to Act or Warn*

**32.**     Given recurring 319 history, the August 2022, unsuccessful repair, the December 9 maintenance findings, and BAAN's capability to reveal fault patterns, Crown had at least constructive notice of the dangerous condition. ROA.512-541, 2550-2552, 2779-2780, 2826-2830. Crown returned the truck to service on December 9 without documented BAAN log review and did not warn operators or restrict use, contrary to its own OF3772 safety standard. ROA.512-541, 2550-2552, 2699-2700.

## SUMMARY OF ARGUMENTS

### I. RECUSAL, APPEARANCE OF IMPARTIALITY, AND DUE PROCESS

The Magistrate Judge's unexplained recusal-and-withdrawal sequence, combined with undisclosed professional connections to opposing counsel's firm and subsequent rulings exclusively favoring defendant, violated 28 U.S.C. § 455(a)'s

objective standard. Once a recusal notice enters the public docket signaling potential impartiality concerns, § 455(a) mandates disqualification to preserve confidence in the judiciary—regardless of whether the notice is later characterized as "error." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988). The statute contains no exception for withdrawn recusal notices. District Judge Kinkeade, reviewing the same evidence, denied defendant's dispositive motions three times. Under Magistrate Judge Horan, Defendant prevailed on every contested motion. This pattern creates reasonable perception of partiality requiring reversal.

## II.    ERROR IN GRANTING SUMMARY JUDGMENT ON ALL CLAIMS

The record presents overwhelming evidence creating triable fact issues on all claims. Plaintiff established three concrete safer alternative designs: (1) contamination-resistant sensors; (2) automatic braking upon accelerator-sensor error; (3) operator compartment guarding. Each was technologically feasible, economically practical, and would have prevented Plaintiff's injury. Defendant's own post-incident testing confirmed the hazard—when technicians reproduced the accelerator sensor error, they immediately locked the forklift out as too dangerous to operate. BAAN logs documented 255 Code 319 events over the forklift's life, with eight clustered immediately before the accident. August 2022 work orders show Defendant identified the problem, attempted repairs, documented the unit "was still coding out," yet returned it to service. December 9, 2022, maintenance report

claimed sensors "cleaned and blown off," yet the post-incident inspection revealed dust and debris. Defendant's specifications prove the forklift should stop within 34 inches; Plaintiff had 120-180 inches available, yet the truck accelerated. Texas law does not require eliminating all possible causes—Plaintiff must show the defect was "a producing cause." *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 592 (Tex. 1999). When evidence permits multiple reasonable inferences, summary judgment is improper.

### III.        MISAPPLICATION OF TEXAS § 82.008

The district court treated § 82.008's rebuttable presumption as conclusive immunity. Voluntary ANSI standards are not "a mandatory government regulation" that governs the manufacturing of forklifts and thus Appellee Crown has not met its burden of proof that it qualifies for and is entitled to presumption under § 82.008. *Tansy v. Dacomed Corp.*, 890 S.W.2d 676, 678 (Tex. App.—Houston [14th Dist.] 1994, writ denied). Even if applicable, Plaintiff presented overwhelming rebuttal evidence: three feasible safer alternatives exceeding ANSI requirements; Defendant's actual forklift failed to function as designed (accelerated rather than stopping); and ANSI standards addressed tip-over hazards (29 incidents) while ignoring the dominant injury mode—crush injuries (622 incidents).

### IV.        EXPERT EXCLUSION UNDER DAUBERT AND RULE 702

Both experts are eminently qualified and applied reliable methodologies.

Expert Bullen applied ANSI B56.I-2016 and ANSI B11.0-2015 standards, performed empirical testing of alternative optical switches, and confirmed technological feasibility through Defendant's own admissions. Dr. Kerrigan, Ph.D., applied peer-reviewed biomechanical methodology identical to his federally funded research, citing validated postural equilibrium principles (Horak 2006; Hsiao & Robinovitch 1998) and analyzing Defendant's 5,010- incident database.

The Magistrate Judge's exclusion rested on clearly erroneous findings (that Bullen performed no testing; that Kerrigan's opinions were speculative) and incorrect legal standards (requiring proof of correctness rather than methodological validity; weighing credibility; one-sided scrutiny favoring Defendant's rebuttal expert). *Daubert* requires valid methodology properly applied, not proof the expert is correct. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

## ARGUMENT

**1:**        **RECUSAL, APPEARANCE OF IMPARTIALITY, AND DUE PROCESS VIOLATIONS**

**A.    Standard of Law**

33.    This Court reviews recusal questions de novo. *United States v. Jordan*, 49 F.3d 152, 156 (5th Cir. 1995). Section 455(a) mandates disqualification: "(a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The test is objective—"whether a reasonable person with knowledge of all

the facts would conclude that the judge's impartiality might reasonably be questioned." *United States v. Alabama*, 828 F.2d 1532, 1540 (11th Cir. 1987). The statute protects the appearance of justice, not merely actual bias. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988); *Liteky v. United States*, 510 U.S. 540, 548 (1994). Due process independently requires an impartial tribunal. *Marshall v. Jerrico, Inc.*, 446 U.S. 238,242 (1980). When judicial impartiality is reasonably questioned, due process is violated. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986).

## B.    The Recusal Notice, Withdrawal, and Subsequent Dispositive Rulings Create an Appearance of Impropriety

34.    The record shows a troubling sequence: (1) Magistrate Judge Horan presided over this case; (2) on August 27, 2023, a court-generated recusal notice appeared stating Judge Horan "recused pursuant to Special Order 3-346"; (3) the next day, the notice was characterized as "entered in error" and withdrawn; (4) Judge Horan then excluded both of Mr. Sneed's experts (ROA.2574-2602), denied leave to supplement (ROA.2564-2573), and recommended summary judgment for Crown (ROA.2603-2630)—rulings that ended the case. (ROA.13-14; ROA.5251-52.)

31

| | |
|---|---|
| 29 | ***Please Disregard - Entered in Error*** Court Request for Recusal: Magistrate Judge David L. Horan recused pursuant to Special Order 3-346. Magistrate Judge Irma Carrillo Ramirez assigned for matters that may be referred in this case. (sxf) Modified text on 8/28/2023 (sxf). (Entered: 08/28/2023) |

ROA.6.

**Notice of Electronic Filing**

The following transaction was entered on 8/28/2023 at 8:48 AM CDT and filed on 8/27/2023
**Case Name:**        Sneed v. Crown Equipment Corporation et al
**Case Number:**     3:23-cv-00743-K
**Filer:**
**Document Number:** 29(No document attached)

**Docket Text:**
**Court Request for Recusal: Magistrate Judge David L. Horan recused pursuant to Special Order 3-346. Magistrate Judge Irma Carrillo Ramirez assigned for matters that may be referred in this case. (sxf)**

**3:23-cv-00743-K Notice has been electronically mailed to:**

**35.**    This sequence violates § 455(a). A reasonable observer would question impartiality. Once a recusal notice enters the public docket—for any reason—it signals potential impartiality concerns that cannot be erased by characterizing the notice as "error." A reasonable observer, seeing this sequence, would question whether the judge felt pressure to demonstrate lack of bias (overcompensating by ruling against Plaintiff on every issue) or was predisposed against Plaintiff (explaining the initial recusal concern). *Liljeberg*, 486 U.S. at 860.

**36.**    The "entered in error" explanation is unverifiable and compounds rather than cures the appearance problem. What was the original basis? Who determined

withdrawal was proper—Judge Horan himself? Why not reassign out of caution once impartiality was publicly questioned? The record provides no clarification. This opacity violates § 455(a)'s transparency demands. A reasonable observer, unable to verify the explanation, would question whether withdrawal was proper or influenced by case management concerns.

**C.    Dispositive Rulings After Documented Recusal Attempt Heightens the Heighten the Appearance of Conflict, Bias or Impartiality**

**37.**    Judge Horan's post-withdrawal rulings were outcome-determinative: excluding both experts, denying supplementation, and recommending summary judgment for Crown. Every major ruling favored Crown. While each might be defensible individually, the pattern—following a recusal irregularity—creates a reasonable perception of partiality. District Judge Kinkeade, reviewing the same or less evidence, had denied Crown's dismissal motions three times. (ROA.8, 113- 22, 200-05.) Under Magistrate Judge Horan, Crown prevailed on every contested motion.

**38.**    Section 455(a) does not require proof of actual bias or determining which perception is correct. The statute mandates recusal whenever impartiality "might reasonably be questioned." *Liteky*, 510 U.S. at 548. The recusal-withdrawal- adverse rulings sequence satisfies that standard. This is particularly concerning given public records showing Magistrate Judge Horan was a former partner at Jones Day, where attorney David Jones also served as partner. In 2024, David Jones joined Hartline

Barger LLP—the firm representing Crown in this case. (ROA.6) Despite this chronology corresponding to the August 27 recusal notice, the Magistrate Judge did not disclose the relationship or recuse himself from further proceedings.

**39.** This violates § 455(a) because a reasonable observer would question impartiality. Once a recusal notice enters the public docket, it signals potential impartiality concerns.

**D.      Section 455(a) Contains No Exception for Recusal Notices that are Withdrawn as "Entered in Error" Without Explanation.**

**40.** Even accepting the "error" explanation, recusal was still required. Section 455(a) contains no exception for notices "entered in error." Once impartiality is publicly questioned—for any reason—the statute mandates disqualification to preserve confidence in the judiciary. *Liljeberg*, 486 U.S. at 860-61. Even innocent errors require recusal once impartiality is publicly questioned. The administrative inconvenience of reassignment is outweighed by protecting the appearance of justice. By prioritizing case management over appearance concerns, the Court inverted § 455(a)'s values.

**E.      Due Process Independently Requires Reversal**

**41.** The Fifth Amendment guarantees an impartial tribunal. *Marshall*, 446 U.S. at 242. The recusal-withdrawal sequence created structural pressure on Judge Horan, creating "possible temptation . . . which might lead him not to hold the balance nice, clear, and true." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986). This

structural bias—whether or not consciously felt—violates due process. The violation is compounded by the rulings' cumulative effect: both experts excluded, supplementation denied, summary judgment granted. These decisions eliminated Mr. Sneed's ability to present his case. Due process requires not just an impartial judge but the appearance of impartiality. *In re Murchison*, 349 U.S. 133, 136 (1955). That appearance was fatally compromised here.

**2:**        **ERROR IN GRANTING CROWN SUMMARY JUDGMENT ON APPEALLANT'S PRODUCTS LIABILITY AND NEGEIGENCE CLAIMS**

**A.        Standard of Review**

**42.**    This Court reviews summary judgment de novo, applying the same standard as the district court. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247- 48 (1986).

**B.        Product Liability Claims**

**43.**    ***Design Defect Elements.*** Under Texas law, a plaintiff asserting design defect must establish three elements: (1) the product contained a defect that rendered it unreasonably dangerous as designed; (2) a safer alternative design existed; and (3) the defect was a producing cause of the plaintiff's injuries. Tex. Civ. Prac. & Rem. Code § 82.005(a); *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1040 (5th Cir. 2011). Each element presents a fact-intensive inquiry. The plaintiff need not eliminate all possible causes but must produce evidence from which reasonable jurors could conclude the defect more likely than not caused the injury. *Casey v. Toyota Motor Eng'g & Mfg. N. Am., Inc.*, 770 F.3d 322, 329 (5th Cir. 2014.)

**44.**    ***Manufacturing Defect Elements.*** A manufacturing defect claim requires proof that (1) the product deviated in a material way from the manufacturer's specifications, design, or planned output, and (2) the deviation was a producing cause of injury. *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 196 (5th Cir. 2006). The plaintiff establishes deviation by comparing the actual product to what the

manufacturer intended to produce—whether through specifications, design documents, quality standards, or even the manufacturer's own representations about how the product should perform.

**45.**　　*Failure to Warn Elements.*　A product is defectively designed for failure to warn when, at the time it left the manufacturer's control, the product lacked adequate warnings about dangers the manufacturer knew or should have known, and this failure was a producing cause of injury. *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 257-58 (Tex. 1999). The adequacy of warnings involves both whether a warning was given at all and whether any warning provided was sufficient to alert users to the specific risk that materialized.

## 1.　　Design Defect—Three Concrete Safer Alternative Designs

**46.**　　Under Texas law, a plaintiff asserting design defect must establish: (1) the product contained a defect rendering it unreasonably dangerous as designed; (2) a safer alternative design existed; and (3) the defect was a producing cause of injury. **Tex. Civ. Prac. & Rem. Code § 82.005(a)**; *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1040 (5th Cir. 2011). Each element presents fact-intensive inquiry inappropriate for summary judgment when competing evidence exists.

**47.**　　*Alternative Design #1: Fail-Safe Automatic Braking Software.* The record establishes Crown's controller detected Code 319 faults proven by BAAN logs, ROA.2826-2830, yet failed to command automatic braking. Bullen opined that

programming automatic braking upon detecting accelerator-sensor faults was technologically feasible and consistent with ANSI B11.0/B56.1 safety hierarchies requiring elimination of hazards through design rather than reliance on operator intervention. ROA.932-963, 1459-1461, 3699-3706. Crown's own post-incident testing devastatingly supports this alternative: when technicians reproduced the accelerator sensor error during plugging, they immediately locked and tagged the forklift out of service as too dangerous to operate. ROA.2697- 2698, 2816-2818. This demonstrates Crown's own recognition that this fault required immediate stopping—exactly what automatic braking would achieve. A reasonable jury could conclude that if Crown's technicians deemed the fault serious enough to immediately remove the truck from service, programming the controller to automatically brake upon that fault was both feasible and necessary.

48. ***Alternative Design #2: Contamination-Resistant Sensors with Higher Ingress Protection***. Post-incident inspection found dust and debris on optical sensors (ROA.2550-2552, 2816-2818) just eleven days after Crown claimed the unit was "cleaned and blown off." (ROA.2812-2813.) Bullen identified higher- ingress-protection (IP) rated components—such as sealed magnetic or hall-effect sensors—that substantially reduce spurious signals and false accelerator faults in contaminated environments. ROA.1741-1742, 3698-3704. Crown deployed its forklift in Target warehouses—environments it knew contained dust from cardboard, packaging

materials, and concrete floors. Crown was on notice of contamination issues through repeated service calls for Code 319 faults ROA.2826-2830, 512-541 at 52-55 and post-incident debris findings. ROA.2550- 2552. A jury could reasonably conclude that using contamination-prone optical sensors without adequate ingress protection in an environment Crown knew would contaminate them constituted unreasonably dangerous design.

**49.    *Alternative Design #3: Physical Containment and Crush Zone Guarding*.** Drawing on Crown's own database of 5,010 forklift incidents and validated biomechanical literature, Dr. Kerrigan opined that lightweight doors or gates and back-rest sensors were feasible, would minimally impede egress, and would have prevented the left lower extremity crash injury Mr. Sneed suffered. ROA.3898-3924, 1744-1748. The video evidence and biomechanical analysis establish that when Mr. Sneed lifted his foot to brake in response to sudden acceleration, normal postural equilibrium reflexes caused his leg to project outside the operator compartment. ROA.1037-1041, 3900-3907. This was not operator error—it was involuntary biomechanical response to balance perturbation grounded in established principles of human postural control documented in peer-reviewed literature. Crown's incident database provides compelling support:  the 5,010 documented incidents  reveal lower extremity injuries from operator compartment egress are a known, recurring problem. ROA.1035-1039, 1040-1184. When a manufacturer's own data shows a

pattern of injuries from a particular hazard, a jury may find that failing to guard against that hazard through feasible design modifications constitutes unreasonable danger.

**50.**    ***Causation Evidence Defeats Summary Judgment***. Mr. Sneed provided sworn testimony that he attempted to brake and plug the forklift when it suddenly accelerated toward the wall. ROA.3267-3272, 3269-3270. Crown's post-incident replication of the same accelerator sensor fault during the same plugging maneuver directly links the defect to loss of control. ROA.2697-2698, 2816-2818. Crown's own specifications prove that at 3-3.5 mph, the forklift should stop within approximately 34 inches when plugging and 26 inches with service braking. ROA.512-548, 3264. Mr. Sneed had 120-180 inches available—more than four times the specified stopping distance. Yet the forklift did not stop—it accelerated. The inescapable inference: the braking and plugging systems failed to function as designed. Texas law does not require plaintiffs to "rule out all other possible sources or causes of the injury." *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 592 (Tex. 1999).

**51.**    Mr. Sneed must only show genuine material disputes on his Manufacturing defect claims against Crown on the following fact issues: (1) material deviation from specifications; and (2) the defect was the producing cause of injuries and damages. *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 196 (5th Cir. 2006). BAAN logs show

aberrant behavior: repeated Code 319 (accelerator sensor fault) and Code 105 (brake coil failure) errors clustered at hour meters 7276-7270, immediately surrounding the accident. ROA.2826-2830. This is aberrant for a forklift that, according to Crown's specifications, should default to controlled stop upon detecting such faults. (ROA.512-541 at 54-55.) The clustering of error codes indicates the truck was not performing as Crown intended—the definition of manufacturing defect.

52.    *Crown's service records document persistent deviation*. In August 2022, Work Order W643335 documented Code 319, noted the RPS1 sensor was "out of adjustment," replaced components, yet concluded the unit "was still coding out." ROA.512-541. Crown identified the problem, attempted repairs, and documented that the malfunction persisted—yet returned the forklift to service. This is concrete evidence of persistent deviation from proper specifications. The pre-incident preventive maintenance service on December 9, 2022, claimed the truck was "cleaned and blown off' ROA. 2812-2813, yet post-incident inspection found dust and debris across the optical switch assembly. ROA.2550-2552, 2816-2818. Either Crown's technicians failed to properly clean the sensors or contamination accumulated so rapidly that the sensors were inherently unable to maintain proper function—supporting both manufacturing and design defect claims.

53.    *Crown's post-incident diagnostic testing confirms intermittent, latent defect*.

Only after lengthy test drive—mimicking Mr. Sneed's extended operation—did technicians replicate the Code 319 fault during plugging. (ROA.2697-2698, 2816-2818.) The fact that extended operation was required to trigger the fault explains why routine maintenance checks missed it—but does not excuse Crown. A manufacturing defect that manifests only under certain operating conditions is still a manufacturing defect creating triable fact issues. *Hodges*, 474 F.3d at 196.

### 3.    Failure to Warn – Strict Product Liability if Danger is Forseeable

54.    Texas law requires: (1) product lacked adequate warnings of risks manufacturer knew or should have known; (2) failure was producing cause. *Hernandez v. Tokai Corp*., 2 S.W.3d 251, 257-58 (Tex. 1999). Crown had actual knowledge through multiple sources. The BAAN system continuously logged Code 319 events, giving Crown real-time notice of accelerator sensor faults. ROA.2779-2780, 2826-2830. Service records documented ten work orders between February 2022 and December 2022 identifying recurring malfunctions of safety-critical systems. ROA.3001-3091, 2550-2552, 2812-2813, 512-541. Crown's incident database contained 5,010 forklift incidents, including 622 lower extremity crush injuries—establishing actual knowledge of foreseeable hazards. ROA.1035-1039, 1040-1184.

55.    In the present case, despite this knowledge, Crown never warned Mr. Sneed that Code 319 faults could occur or that they might defeat normal braking. Mr. Sneed

testified he had never seen the ROR:319 code before the accident and was never trained on what it meant. ROA.3272, 3141-3355. Crown's manuals contained general safety information but no specific guidance on accelerator sensor faults. ROA.2699-2700, 2724-2745, 3092-3122. Crown's daily checklist emphasized removing equipment if "in any way unsafe," ROA.2699-2700, but operators cannot recognize that Code 319 makes equipment unsafe if never told what it is. Had Crown warned about Code 319 faults and potential loss of braking, Mr. Sneed could have recognized the fault, avoided the plugging maneuver, removed the truck from service, or positioned himself differently. The absence of warning eliminated these options. A jury could find lack of warning was producing cause. *Hernandez*, 2 S.W.3d at 257-58.

### C.    Negligence Claims (Independent of Product Liability)

**56.**    Negligence requires duty, breach, damages, and causation. *IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401,404-05 (Tex. 2009). Crown's negligence is established through multiple independent duty breaches creating jury questions. Summary judgment on negligence is disfavored because breach and causation involve fact-intensive assessments of reasonableness and foreseeability. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005).

### 1.    Negligent Design

57.    Crown breached its duty to exercise reasonable care in designing the RC 5500 by: (a) selecting contamination-prone optical sensors for dusty warehouse environments (ROA.1741-1742, 3698-3704); (b) failing to implement fail-safe software commanding automatic braking upon accelerator sensor faults despite ANSI B11.0/B56.1 safety hierarchies prioritizing automatic shutdown (ROA.1459-1461, 3699-3706, 932-963); and (c) designing an open operator compartment without doors despite Crown's 5,010-incident database documenting recurring lower extremity crush injuries ROA.3898-3924, 1035—1039. Crown's post-incident conduct proves negligence: when technicians reproduced the accelerator sensor error, they immediately locked and tagged the unit out as too dangerous to operate (ROA.2697-2698)—the safety response Crown negligently failed to program.

## 2.    Negligent Manufacturing, Maintenance, and Quality Control

58.    Crown breached duties in manufacturing, quality control, and ongoing maintenance. The August 2022 work order documented the RPS1 sensor "out of adjustment," attempted repairs, yet concluded the unit "was still coding out"— then returned it to service with the known, unresolved defect. ROA.512-541. On December 9, 2022—eleven days before the accident—Crown represented the forklift was "cleaned and blown off," ROA.2812-2813, yet post- incident inspection revealed dust and debris across optical sensors ROA.2550- 2552, 2816-2818. Either Crown falsified records or its cleaning was inadequate. Crown's BAAN system

44

logged Code 319 and Code 105 faults repeatedly, ROA.2826-2830, giving real-time notice of safety-critical malfunctions, yet Crown took no proactive action to inspect or remove the forklift from service despite installing monitoring specifically to detect such faults.

### 3.    Negligent Supervision and Monitoring

59.    Crown employed technician Micah Walker—hired 78 days before accident—who admitted being "not sure what dust or debris had to do with the operation of the machine." ROA.3926-4066. This fundamental ignorance demonstrates inadequate training. Lead technician Morris testified oversight came from "whoever was available" and could not identify any specific supervisor quality-checking new technicians. ROA.3978-3979.

60.    Crown equipped this forklift with BAAN 24/7 live error monitoring specifically to receive real-time fault notifications. ROA.2779-2780, 2826-2830. The system logged Code 319 and 105 errors repeatedly surrounding theaccident. ROA.2826-2830.

61.    Crown deployed a monitoring system, received fault notifications indicating safety-critical malfunctions, yet failed to inspect or remove the forklift before catastrophic failure. Crown created duty through monitoring; having undertaken to monitor, Crown was obligated to respond reasonably to fault notifications.

62.    BAAN logs gave Crown real-time notice that accelerator sensors and brake

systems were malfunctioning. A reasonably prudent service provider would immediately inspect equipment and prohibit use until repairs completed.

63.    Crown's inaction foreseeably led to injury. Logged faults indicated exactly the control malfunction (accelerator sensor error defeating braking) that occurred. Had Crown responded to its monitoring data by removing the forklift, the accident would not have occurred.

64.    Crown designed, installed, and operated the monitoring system to detect these conditions. A jury could find receiving fault notifications yet failing to act fell below reasonable care standard.

65.    This constitutes negligence per se or gross negligence. Crown knew safety-critical system was malfunctioning, attempted fix, confirmed fix unsuccessful, yet allowed defective equipment to remain in operation. Crown's duty required: (1) successfully resolve fault; (2) replace defective components; or (3) permanently remove equipment. Doing none was negligent.

### 4.    Negligent Training, Instructions, and Supervision

66.    Crown provided training materials but negligently failed to train operators on critical safety information. ROA.2724-2745, 3092-3122, 3133-3140.

67.    Mr. Sneed testified he had never seen Code ROR:319 and was not trained on accelerator sensor faults—how they manifest or how to respond. ROA.3272, 3141-3355.

68. BAAN logs, service records, and work orders documented Code 319 events. Crown had actual knowledge this was recurring reality, not theoretical risk.

69. Crown's post-incident replication showed accelerator sensor errors manifested during plugging—when operators depend on braking. Crown knew or should have known this fault could compromise stopping ability.

70. Training operators to recognize and respond was feasible. Crown could have added Code 319 to training materials, explained causes (contamination, sensor misalignment), instructed operators to remove equipment if faults appear, and provided alternative stopping procedures. Crown's training materials directed operators to remove equipment if "in any way unsafe" (ROA.2699-2700), but this generic instruction was inadequate. An operator cannot recognize Code ROR:319 renders equipment unsafe if never told what Code 319 is. Crown's training was negligently incomplete.

71. BAAN displayed fault codes to operators, yet Crown provided no training on interpreting codes or understanding safety implications. A reasonably prudent manufacturer equipping forklifts with diagnostic displays would train operators to recognize critical fault codes indicating unsafe conditions requiring immediate shutdown. Crown's failure was negligent, particularly given actual knowledge Code 319 and 105 indicated safety-critical malfunctions.

72. Crown employed Walker—hired 78 days pre-accident—who admitted

ignorance about contamination-sensitive optical sensors. Supervision was ad hoc; Morris testified oversight from "whoever was available" without specific supervisor quality-checking technicians. ROA.3978-3979. Crown never trained Mr. Sneed on Code 319 faults despite knowledge through BAAN logs, service records, and incident database that such faults occurred and posed safety risks.

73.   By late 2022, Crown accumulated substantial evidence optical sensor contamination and Code 319 faults posed safety risks: (a) multiple work orders documenting Code 319 ROA.512-541; (b) BAAN data showing recurring accelerator sensor faults ROA.2826-2830; (c) incident database documenting forklift injuries ROA.1035-1039; and (d) field service experience showing sensors required frequent cleaning ROA.2812-2813.

74.   A reasonably prudent manufacturer would initiate corrective action—a formal recall, proactive retrofit program to install higher-IP sensors, or minimum safety bulletin. Crown did none. Crown allowed known-defective forklifts to remain in service without correction or enhanced warnings.

5.   *Negligence in Failing to Implement Recommendations from Its Own Incident Database.*

75.   Crown maintained database of 5,010 forklift incidents—valuable resource for identifying hazard patterns. ROA.1035-1039, 1040-1184. Dr. Kerrigan analyzed this database and identified recurring lower extremity injury patterns preventable

through guarding modifications. ROA.3898-3924.

76.     Crown's negligence lies in collecting safety data but failing to act. A reasonably prudent manufacturer documenting thousands of incidents has duty to: (1) analyze patterns to identify hazards; (2) implement design changes addressing recurring injury mechanisms; (3) issue warnings based on trends; and (4) retrofit existing equipment to incorporate safety improvements.

77.     Crown did none despite clear patterns. This is analogous to pharmaceutical companies documenting adverse events but failing to update warnings—conduct universally recognized as negligent. Crown's incident database gave actual knowledge of foreseeable risks, imposing duty to respond reasonably. Failure was negligent.

## 6.     Negligent Failure to Warn

78.     Separate from the strict products liability failure-to-warn claim, Crown's conduct constitutes common-law negligence for failing to exercise reasonable care in warning about known dangers.

79.     **Crown Had Superior Knowledge of Specific Hazards**. Crown possessed knowledge vastly superior to Mr. Sneed's incident, regarding: a) The existence and meaning of Code 319 accelerator sensor faults, b) The vulnerability of optical sensors to contamination in warehouse environments, c) The history of Code 319 events on this specific forklift (logged in BAAN); d)The potential for accelerator

49

sensor faults to defeat braking and plugging, and e) Crown's own incident database showing patterns of forklift injuries, ROA.1035-1039, 2779-2780, 2826-2830, 512-541.

80.     Texas law imposes a duty on those with superior knowledge to warn those who lack such knowledge of dangers that are known to the former but not reasonably discoverable by the latter. *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493,494-95 (Tex. 1991). Mr. Sneed had no way to know about Code 319 faults, their causes, or their safety implications—that information was exclusively within Crown's possession and control. A reasonably prudent manufacturer, confronting this pattern of evidence indicating a safety defect, would initiate corrective action— either a formal recall, a proactive retrofit program to install higher-IP-rated sensors, or at minimum a safety bulletin to customers. Crown did none of these. Instead, Crown allowed known-defective forklifts to remain in service without correction or enhanced warnings.

81.     Crown's failure to recall, retrofit, or issue safety bulletins despite documented evidence of recurring safety-critical faults was negligent. The causation connection is direct: had Crown recalled this forklift or retrofitted it with contamination-resistant sensors, Mr. Sneed's accident would not have occurred.

### D.     Causation: But-For and Proximate Causation Established

82.     Each of appellants negligence theory satisfies but-for (direct) and proximate

causation without an intervening or superseding cause:

1.  **Design negligence** But for contamination-prone sensors, lack of fail-safe software, inadequate guarding, injury would not have occurred ROA.1459-1461, ROA. 3689-3706, and ROA. 3898-3919.; and

2.  **Manufacturing negligence**—but for negligent quality control failing to detect sensor misalignment and inadequate testing, defective forklift would not have reached field; and

3.  **Maintenance negligence**—but for negligent December 9 service failing to clean sensors, contaminated sensors would have been cleaned, preventing accelerator sensor fault; and

4.  **Failure to monitor BAAN**—but for negligent failure to act on Code 319 and 105 notifications, forklift would have been removed before catastrophic failure; and

5.  **Failed repair negligence**—but for returning forklift to service after August 2022 air failed to resolve Code 319, equipment would have been permanently removed; and

6.  **Training/Supervision negligence**—but for failure to train on Code 319 faults, Mr. Sneed would have recognized danger and removed forklift or responded differently; and

7.  **Warning negligence**—but for failure to warn about accelerator sensor faults

and loss of braking, Mr. Sneed would have been alerted and taken protective measures.

**83.** Each causal chain is foreseeable and direct—no superseding causes or unforeseeable intervening events. Mr. Sneed used forklift exactly as Crown intended, in environment Crown knew it would operate, performing exact maneuver Crown's training prescribed. Accident resulted directly from Crown's negligent acts and omissions. *IHS Cedars Treatment Ctr.,* 143 S.W.3d at 798.

**E.        Crown's Affirmative/Contractual Duties Under Service Agreement**

**84.** Crown's service agreement with Target (ROA.2701-2709) created affirmative duties to inspect, maintain, and repair the forklift using proper procedures. Crown breached these contractual obligations, constituting independent negligence. Crown's Pre-Delivery Inspection Checklist requires comprehensive testing before release to service (ROA.2710-2723), and its Operator's Daily Checklist mandates removal from service of any truck "in any way unsafe" (ROA.2699-2700)—yet Crown returned the forklift to service on December 9 after brief check, with broken bolt merely removed, systemic chain misalignment corrected without root-cause analysis, no BAAN log review, and no warnings. ROA.2550-2552, 2826-2830, 512-541.

**85.** Crown's service agreement with Target created contractual duties that reinforce and potentially exceed its common-law negligence duties. ROA.2701-

2709. While the specific terms are within Crown's control, the existence of a service contract typically imposes duties to: 1) Perform inspections with reasonable care and competence; 2) use proper diagnostic procedures to identify defects; 3) Complete repairs in a workmanlike manner; 4) Document service accurately and honestly; 5) Notify the customer of safety concerns discovered during service; and 6)Recommend equipment retirement or replacement when repairs are inadequate.

86.    Crown's breach of these contractual/professional duties constitutes negligence. The August 2022 work order showing Crown "was still coding out" after repair, ROA.512-541, and the discrepancy between the December 9 "cleaned and blown off" notation and the post-incident contamination finding, ROA.2812-2813, 2550-2552, provide concrete evidence that Crown failed to meet its contractual and professional obligations.

87.    Each negligence theory satisfies but-for and proximate causation. These are quintessential jury questions about reasonableness, foreseeability, and breach—not appropriate for summary judgment. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005).

**F.   *Gross Negligence: Crown's Conduct Exhibited Conscious Indifference***

88.    Gross negligence requires: (1) objective awareness of extreme risk; (2) conscious indifference. *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 785

(Tex. 2001).

**89.**    Crown had objective awareness: (a) BAAN monitoring provided real-time notice of Code 319 and 105 faults in safety-critical systems; (b) service records documented recurring Code 319 events Crown could not resolve (August 2022 "still coding out"); (c) Crown's post-incident replication showed faults serious enough to warrant immediate lockout/tagout; and (d) incident database contained 5,010 documented incidents establishing injury patterns.

**90.**    Crown exhibited conscious indifference: (1) despite knowing Code 319 persisted after August 2022 repairs, returned forklift to service without resolution; (2) despite receiving BAAN fault notifications, took no proactive action to inspect or remove forklift; (3) despite knowing sensors required cleaning, negligently allowed rapid re-contamination without adjusting service intervals; and (4) despite data showing recurring injury patterns, failed to modify designs, issue warnings, or implement recalls.

**3:**    **MISAPPLICATION OF <u>TEX. CIV. PRAC. & REM. CODE § 82.008</u> PRESUMPTION AND REBUTTAL**

**A.**    **Standard of Review**

**91.**    Section 82.008(a) creates a rebuttable presumption that a product is not defective if it complied with applicable government safety standards when manufactured and placed into commerce. <u>Tex. Civ. Prac. & Rem. Code § 82.008(a)</u>. However, this presumption applies only when: (1) a government safety standard actually exists governing the specific product feature at issue; (2) the defendant proves compliance with that standard at the time of manufacture and sale; and (3) the plaintiff has opportunity to rebut the presumption through evidence that compliance was insufficient to render the product reasonably safe. *Bristol-Myers Squibb Co. v. Hancock*, <u>321 S.W.3d 53, 60</u> (Tex. App.—Texarkana 2009, pet. denied). Texas law disfavors applying § 82.008 to grant summary judgment because the presumption is designed to be tested before a jury, not resolved by court as matter of law. *In re Zimmer Durom Hip Cup Prods. Liab. Litig.*, <u>396 F. Supp. 3d 597, 615</u> (S.D. Tex. 2019).

**B.**    **No Applicable Mandated Government Safety Standard Governed the Specific Defects at Issue.**

**92.**    The Magistrate Judge erroneously recommended summary judgment based on Crown's purported compliance with ANSI B56.1 forklift safety standards. (<u>ROA 2603-2630</u>.) This was legal error for multiple independent reasons. First, ANSI

B56.1 is a voluntary consensus standard, not a "government safety standard" within § 82.008's meaning. The Texas Supreme Court has held § 82.008 applies only to mandatory government regulations—federal statutes, agency regulations with force of law, or state safety codes—not voluntary industry consensus standards. *Tansy v. Dacomed Corp.,* 890 S.W.2d 676, 678 (Tex. App.—Houston [14th Dist.] 1994, writ denied). ANSI standards are developed by private industry groups and lack governmental enforcement mechanisms. While OSHA occasionally incorporates ANSI standards by reference, Crown presented no evidence that the specific ANSI B56.1 provisions at issue were incorporated into mandatory OSHA regulations at the relevant time. Absent such incorporation, ANSI B56.1 cannot trigger § 82.008's presumption.

93.     Second, even if ANSI B56.1 qualified as a "government safety standard," Crown failed to establish that specific ANSI provisions governed the three defects Plaintiff identified: (1) contamination-prone optical sensors; (2) absence of fail-safe automatic braking software upon accelerator-sensor error; and (3) open operator compartment without crush-zone guarding. Section 82.008 requires compliance with standards governing "the specific aspect of the product's design, manufacturing, warnings, or instructions that is alleged to have caused the claimant's injury." Tex. Civ. Prac. & Rem. Code § 82.008(c).

94.     Crown made no showing—and the record contains no evidence—that ANSI

B56.1 contains specific provisions requiring: use of optical sensors rather than contamination-resistant alternatives; prohibition of automatic braking upon accelerator-sensor faults; or elimination of operator compartment doors. To the contrary, Plaintiffs expert Bullen explained that ANSI B56.1 and ANSI Bl 1.0 establish risk-assessment hierarchies prioritizing elimination of hazards through design over reliance on operator intervention—standards Crown violated by failing to implement automatic braking and contamination-resistant sensors. (ROA 1459-1461, 932-963.) Thus, even accepting ANSI B56.1 as applicable, Crown's design violated rather than complied with the standards' fundamental safety hierarchy.

95.     Third, the district court improperly applied § 82.008 to manufacturing defect and failure-to-warn claims, where no government standard is alleged to apply. Section 82.008 requires identification of a specific government standard governing the aspect of the product alleged to be defective. For manufacturing defect claims, Plaintiff alleged the forklift deviated from Crown's own specifications—BAAN logs showing Code 319/105 errors; August 2022 work order documenting RPS1 sensor "out of adjustment" with unit "still coding out" after repair; December 9,2022 maintenance claiming sensors "cleaned and blown off' yet post-incident inspection revealing dust and debris. ROA.2826-2830, 512-541 at 52, 2812-2813, 2550-2552. Crown identified no government standard defining acceptable sensor contamination levels or permissible error- code frequency.

## C.     Plaintiff Presented Substantial Evidence Rebutting Any Presumption

96.     Even assuming § 82.008 applied (which it does not), Plaintiff presented overwhelming evidence rebutting any presumption of non-defectiveness. Section 82.008(b) expressly permits rebuttal through evidence that "the product's compliance with the government safety standard was not sufficient to make the product reasonably safe for its intended use." Tex. Civ. Prac. & Rem. Code § 82.008(b). Texas courts have recognized several methods of rebutting § 82.008's presumption: (1) evidence the standard was inadequate to address the specific hazard; (2) evidence of feasible safer alternatives beyond the standard's requirements; (3) evidence the defendant's actual product failed to comply with the standard in practice; or (4) evidence the standard was outdated or inapplicable to the product's actual use. *Ackermann*, 526 F.3d at 209-10.

97.     Plaintiffs evidence satisfies each rebuttal method. First, inadequacy of the standard: Bullen and Kerrigan explained that even if Crown met ANSI B56.1's baseline requirements, those requirements were insufficient to address the specific hazards this forklift presented—contamination-sensitive optical sensors in dusty warehouse environments; lack of fail-safe braking upon sensor error; and open operator compartment exposing operators to crush injuries during involuntary balance-reflex responses. (ROA.1459-1461, 3698-3706, 3898— 3924.) ANSI B56.1's general provisions did not specifically address these hazards, rendering

compliance insufficient to make the product reasonably safe.

**98.** Second, feasible safer alternatives beyond the standard: Plaintiff identified three concrete safer alternative designs: (a) higher-ingress-protection optical switches or sealed magnetic sensors substantially reducing contamination- induced faults; (b) automatic braking software commanding immediate stop upon detecting accelerator-sensor error; and (c) lightweight doors or back-rest pressure sensors preventing operator limb projection beyond the protected zone. ROA.1741-1742, 1459-1461, 3898-3924. Each alternative was technologically feasible, economically practical, and would have prevented Mr. Sneed's injury without impairing forklift function. Crown's own post-incident testing confirmed the hazard—when technicians reproduced the accelerator sensor error, they immediately locked and tagged the forklift out, demonstrating Crown's own recognition that the fault was too dangerous for continued operation. ROA.2697- 2698. If Crown's technicians deemed manual lockout necessary, automatic braking upon that fault was both feasible and necessary—a safety measure exceeding ANSI B56.1's baseline requirements.

**99.** Third, failure to comply in practice: Even if Crown's design nominally met ANSI B56.1 on paper, the actual forklift as delivered to Target and maintained by Crown failed to meet the standard's safety objectives in practice. BAAN logs documented 255 Code 319 events over the forklift's operational life, with eight

events clustered immediately before the accident. ROA.2826-2830, 512-541. Crown's own specifications stated that upon Code 319 event, "productive travel is removed and the RC5500 will be brought to a controlled stop" ROA.512-541—yet Mr. Sneed's truck accelerated rather than stopping, demonstrating the forklift failed to function as Crown designed and ANSI B56.1 contemplated. August 2022 work order documented RPS1 sensor "out of adjustment" with unit "was still coding out" after repair, yet Crown returned it to service. ROA.512-541. December 9, 2022, maintenance claimed sensors "cleaned and blown off," yet post-incident inspection revealed dust and debris. ROA.2812-2813, 2550-2552. This pattern of persistent malfunction, inadequate maintenance, and falsified records demonstrates Crown's actual forklift—as delivered and maintained—failed to meet safety standards even if nominal design compliance existed.

100. Fourth, outdated or inapplicable standard: Crown cited ANSI B56.1 provisions addressing tip-over hazards and overhead guard requirements—provisions designed to protect operators from falling loads and forklift tip-over, not from accelerator-sensor malfunction and crush injuries from limb projection. Dr. Kerrigan's analysis of Crown's 5,010-incident database revealed left-lower-extremity crush injuries occurred more than 20 times more frequently than fatal tip-over incidents (622 cases vs. 29). ROA.3912-3915. Crown's design addressed tip-over hazards (1% of incidents) while ignoring the dominant injury mode (crush

injuries from limb projection, 12.4% of incidents). Compliance with standards addressing rare hazards while ignoring frequent hazards does not satisfy § 82.008's purpose of ensuring reasonable safety. ANSI B56.1's focus on tip-over protection was inapplicable to the actual hazards this forklift presented.

**D.    Summary Judgment Based on § 82.008 Presumption Violated Rule 56 and Texas Substantive Law**

101.    The Magistrate Judge's reliance on § 82.008 to recommend summary judgment violated Federal Rule 56 and Texas substantive law. First, Crown bore burden of proving applicability of § 82.008 by establishing: (1) a government safety standard existed; (2) the standard governed the specific defects alleged; and (3) Crown complied with that standard at time of manufacture and sale. *Bristol-Myers Squibb*, 321 S.W.3d at 60. Crown failed to satisfy this burden—it identified no mandatory government regulation (only voluntary ANSI standards), identified no specific provisions governing optical sensor selection or automatic braking requirements, and presented no evidence of actual compliance given the forklift's documented malfunction history.

102.    Second, even if Crown satisfied its initial burden, Plaintiff presented substantial rebuttal evidence creating genuine disputes of material fact precluding summary judgment. Section 82.008's presumption is designed to be tested before a jury—not resolved by court as matter of law on summary judgment—unless the plaintiff wholly fails to present rebuttal evidence. *Zimmer Durom*, 396 F. Supp. 3d

61

at 615. Here, Plaintiff presented extensive rebuttal evidence through two qualified experts, Crown's own post-incident testing, BAAN logs, maintenance records, and Crown's incident database. This evidence created triable issues on whether compliance with ANSI B56.1 (if proven) was sufficient to render the forklift reasonably safe. A jury must assess whether optical sensors were adequate for dusty warehouses, whether automatic braking should have been implemented, whether operator compartment required guarding, and whether Crown's maintenance practices defeated any design-level compliance. These are quintessentially factual determinations inappropriate for summary judgment.

**103.**    Third, the Magistrate Judge's recommendation conflated design compliance with overall product safety—a fundamental misunderstanding of § 82.008's scope. Section 82.008 addresses only whether the product's design, as originally conceived, met applicable safety standards. It does not immunize manufacturers from liability for: inadequate maintenance (Crown's falsified December 9 cleaning records); negligent repairs (August 2022 work order returning unit to service "still coding out"); failure to respond to monitoring data (Crown's BAAN system logged repeated Code 319/105 faults yet Crown took no action); inadequate training (Walker admitted not understanding dust/debris significance; Mr. Sneed never trained on Code 319); or failure to warn (Crown never informed operators that Code 319 could defeat braking). These are independent negligence claims not governed by § 82.008,

yet the Magistrate Judge granted summary judgment on all claims based on purported ANSI compliance.

## E.     Error Requires Reversal

104.     The Magistrate Judge's erroneous application of § 82.008 was not harmless—it was the primary basis for recommending summary judgment on all product liability claims. ROA. 2603-2630. The recommendation repeatedly relied on Crown's purported "compliance with industry safety standards" to conclude the forklift was not defective. But § 82.008 does not permit such reasoning. The statute creates a rebuttable presumption subject to plaintiff's rebuttal evidence—it does not establish that compliance with safety standards proves non-defectiveness as matter of law. By treating § 82.008 as conclusive rather than rebuttable, the Magistrate Judge effectively converted a burden- shifting statute into an immunity provision, contrary to Texas Supreme Court precedent. Ackermann, 526 F.3d at 209.

105.     The Fifth Circuit has repeatedly held that misapplication of statutory presumptions in product liability cases requires reversal and remand for jury trial. *Ackermann*, 526 F.3d at 209-10; *Porterfield v. Ethicon, Inc.*, 183 F.3d 464, 467 (5th Cir. 1999). Section 82.008's presumption—if applicable at all—merely shifts the initial burden of production. Once plaintiff presents rebuttal evidence, the presumption "disappears" and the factfinder must assess all evidence without benefit of presumption. *Bristol-Myers Squibb*, 321 S.W.3d at 60. Here, Plaintiff presented

substantial rebuttal evidence through expert testimony, Crown's own testing and records, and Crown's incident database. That evidence required submission to a jury—not resolution on summary judgment based on an inapplicable statutory presumption.

**106.** This Court should reverse the district court's adoption of the Magistrate Judge's recommendations, hold that § 82.008 does not apply to this case, and remand for trial on all product liability and negligence claims. In the alternative, even if § 82.008 applied, this Court should hold that Plaintiff presented sufficient rebuttal evidence to create genuine disputes of material fact precluding summary judgment, requiring submission of all claims to a jury.

**4:      ERROR IN EXCLUDING APPELANT'S EXPERTS**

**A.      Standard of Review**

107.    The proponent need not prove the expert is undoubtedly correct or that the expert's theory is "generally accepted" in the scientific community—only that the methodology is scientifically valid and properly applied. *Daubert*, 509 U.S. at 595. The trial court's gatekeeping role "is not intended to supplant the adversary system or the role of the jury." *Pipitone*, 288 F.3d at 244. When qualified experts employ accepted methodologies and base opinions on sufficient facts, any weaknesses go to weight, not admissibility, and should be explored through cross-examination. *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996).

108.    Federal Rule of Evidence 702, as amended, governs expert admissibility. An expert may testify if: (a) the expert's specialized knowledge will help the trier of fact; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied those principles and methods to the facts of the case. Fed. R. Evid. 702. The Supreme Court's Daubert trilogy establishes the framework for assessing reliability. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

109.    The proponent of expert testimony need only demonstrate admissibility by a preponderance of the evidence—a "more likely than not" standard. *Mathis* v. *Exxon*

*Corp.,* 302 F.3d 448, 459-60 (5th Cir. 2002). "The test is not the correctness of the expert's conclusions but the soundness of his methodology." *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 244 (5th Cir. 2002). "Vigorous cross- examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

110.    Critically, disputes about the accuracy or credibility of expert opinions go to weight, not admissibility. *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996). When experts employ generally accepted methodologies and apply them to case-specific facts, "the district court's role is not to determine which expert is right, but only whether each expert's testimony is reliable enough to be considered by the jury." *Scordill v. Louisville Ladder Grp., LLC*, 2003 WL 22427981, at *5 (N.D. Tex. Oct. 24, 2003).

111.    District courts must be "careful not to conflate questions of admissibility with questions of weight." *Knight*, 482 F.3d at 352. The exclusion of qualified experts based on disagreements about their conclusions—rather than their methodologies—constitutes an abuse of discretion that this Court routinely reverses. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 990-91 (5th Cir. 1997).

## B.      Robert Bullen, P.E., J.D. Is Eminently Qualified and Applied Reliable Engineering Methodology

112.    The Magistrate Judge erred in recommending exclusion of Robert Bullen,

P.E., J.D. Mr. Bullen holds B.S. in Mechanical Engineering (University of Maryland, 1993), J.D. (William H. Bowen School of Law, 2020), and is licensed as Professional Engineer in more than a dozen states including Texas. ROA.1670-1671. With over 30 years' experience in mechanical design, machine guarding, and industrial safety systems—including service as Senior Engineer at Ryan Forensics, Project Engineer at Mid-South Engineering, and Manufacturing Engineer at AAI Corporation—Mr. Bullen possesses precisely the qualifications necessary to opine on forklift design defects, safer alternative designs, and engineering causation. ROA.1670-1671, 932-934. His combined engineering and legal expertise uniquely qualifies him to evaluate whether Crown's design met applicable safety standards and industry best practices. The Fifth Circuit has repeatedly held that professional engineers with decades of hands-on experience in the relevant field are qualified to testify about product defects and safer alternatives. *Mathis v. Exxon Corp.*, 302 F.3d 448, 460 (5th Cir. 2002).

**113.** Mr. Bullen applied universally accepted engineering-design methodology grounded in ANSI B56.1-2016 Safety Standard for Low Lift and High Lift Trucks and ANSI B11.0-2015 Safety of Machinery. ROA.938-963. He conducted detailed engineering analysis of the forklift's control-system schematics, optical switch configuration, and braking response using established risk-assessment hierarchy to identify three safer alternative designs: (1) substitution of more robust optical switch

that are less sensitive to dust/debris interference; (2) programming control module to automatically initiate braking when accelerator-sensor error occurs; and     (3) providing redundant signal verification within drive/brake control loop—confirming these solutions were technologically feasible, economically practical, and consistent with accepted engineering safety standards at time of manufacture. ROA.938-963, 945-951, 955-963, 1460-1461. This methodology is precisely what *Daubert* requires: application of established principles from recognized safety standards to specific product design.

114.  Critically, Mr. Bullen did not rely solely on theoretical analysis—he performed empirical testing. In his sworn Affidavit, ROA.1459-1461, Mr. Bullen affirmed he tested alternative optical switches for function and dust/debris sensitivity, confirming the alternate switch was less likely to provide unintended signals and thereby reduced risk of accelerator error. ROA.1460. He verified Crown's own representative Mr. Grisez testified Crown possessed ability to reprogram the RC5535-35 to automatically apply braking upon detection of accelerator-sensor faults. ROA.1460-1461. Based on those findings, Mr. Bullen concluded Crown's failure to implement such available safeguards violated established engineering design priorities recognized by National Safety Council and ANSI safety hierarchy, rendering the forklift unreasonably dangerous and directly causing Mr. Sneed's injuries. ROA.1461, 932-963. This combination of established

methodology, empirical testing, and reliance on industry-recognized safety standards satisfies Daubert's reliability requirements.

115. The Magistrate Judge's exclusion rested on clearly erroneous findings. The recommendation stated Mr. Bullen's opinions were "conclusory" and lacked "sufficient factual basis" because he allegedly did not inspect the actual forklift or perform independent testing. ROA.2574-2602. This finding is contradicted by the record. Mr. Bullen's affidavit expressly states he tested alternative optical switches. ROA. 1460.

116. The Fifth Circuit has held that experts need not personally inspect the specific product at issue when opinions are based on specifications, testing of comparable components, and industry standards. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). Mr. Bullen's methodology— analyzing design documents, testing alternative components, and applying established engineering standards—is precisely the methodology professional engineers routinely employ and courts consistently approve.

117. Moreover, the Magistrate Judge improperly weighed Mr. Bullen's credibility and conclusions rather than assessing methodology and qualifications. The recommendation questioned whether Mr. Bullen's proposed alternatives were "truly feasible" and whether his causation opinions were "sufficiently supported"— determinations that invade the jury's province. ROA.2574-2602. Daubert does not

require the expert be correct; it requires the methodology be valid and properly applied. *Pipitone*, 288 F.3d at 244. Crown's own conduct devastatingly supports Mr. Bullen's opinions. When Crown's technicians reproduced the accelerator sensor error during post-incident testing, they immediately locked and tagged the forklift out of service as too dangerous to operate. ROA.2697-2698. If Crown's own technicians deemed manual lockout necessary upon detecting this fault, Mr. Bullen's opinion that automatic braking should have been programmed upon detecting that same fault is not only methodologically sound—it is confirmed by Crown's own actions. This is precisely the type of opinion—grounded in accepted principles and supported by defendant's own conduct—that Daubert is designed to admit.

## C. Jason Kerrigan, Ph.D. Applied Peer-Reviewed Biomechanical Methodology Identical to His Federally Funded Research

118. The Magistrate Judge's exclusion of Dr. Jason Kerrigan, Ph.D. constitutes even more egregious error. Dr. Kerrigan holds Ph.D. and M.E. in Mechanical and Aerospace Engineering (University of Virginia) and serves as Director of UVA's Center for Applied Biomechanics—the world's largest injury-biomechanics research center. ROA 444-517. He has led more than $6 million in federally funded research for U.S. Departments of Transportation and Defense applying engineering and human-factors science to injury prevention. His qualifications are impeccable and directly relevant to analyzing how operators respond biomechanically to unexpected forklift motion and how design modifications can prevent injuries.

119. Dr. Kerrigan employed the same peer-reviewed methodology he uses in his government-funded research and academic publications: he analyzed the forklift's mechanical configuration, BAAN diagnostic logs, and Crown's 5,010- incident accident database; reviewed incident video, deposition testimony, and medical records; and applied validated biomechanical research on human postural equilibrium (Horak 2006; Hsiao & Robinovitch 1998) to explain how involuntary balance reflexes caused Mr. Sneed's limb extension beyond the operator compartment. He then compared Crown's historical design practices and industry studies confirming that doors—previously offered by Crown—would have prevented this foreseeable hazard without impairing function. ROA.1037-1041. This methodology satisfies every Daubert factor: (1) tested—the biomechanical principles Dr. Kerrigan applied are validated through decades of peer-reviewed laboratory studies; (2) peer- reviewed—Dr. Kerrigan cited multiple peer-reviewed publications documenting postural equilibrium reflexes; (3) error rate—biomechanical modeling has known and acceptable error rates documented in scientific literature; and (4) general acceptance—postural equilibrium theory is universally accepted in biomechanics community.

120. Dr. Kerrigan's sworn Declaration confirms his opinions were developed independently of litigation using the same scientific methodology as his federally funded research and peer-reviewed publications. (ROA.1037-1041.) Courts have

consistently held that when an expert applies methodology identical to that used in non-litigation academic research, the methodology is presumptively reliable. *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999). Dr. Kerrigan did not develop new theories for litigation—he applied established biomechanical principles he has used throughout his career studying injury causation for federal agencies. His education, experience, rigorous application of validated biomechanical science, tested and published principles generally accepted within scientific community fully satisfy Daubert and Rule 702 requirements. ROA.444-517, 1037-1041.

121.    The Magistrate Judge's exclusion rested on the erroneous finding that Dr. Kerrigan's opinions about involuntary limb projection were "speculative" and not "sufficiently grounded in biomechanical science."  ROA.2574-2602. This finding ignores the extensive peer-reviewed literature Dr. Kerrigan cited documenting that when standing individuals lift one-foot, postural equilibrium reflexes involuntarily cause weight shift and potential limb extension to restore balance, citing Horak 2006; Hsiao & Robinovitch 1998. These are not speculative theories—they are fundamental principles of human biomechanics validated through decades of laboratory research and universally accepted in the scientific community. Courts "may not exclude expert testimony simply because they find other evidence more persuasive or because they do not believe the expert's conclusion is the best one." *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 422 (5th Cir. 1987).

**122.** Moreover, Dr. Kerrigan's analysis of Crown's 5,010-incident database provides compelling empirical support for his opinions. He analyzed Crown's own data showing left-lower-extremity crush injuries occurred more than 20 times more frequently than fatal tip-over incidents (622 cases vs. 29). ROA.3912-3915, 140-141. This analysis demonstrates the open-compartment design addressed only 1% of hazards while ignoring the dominant injury mode. This is not speculation—it is empirical analysis of defendant's own safety data using accepted epidemiological methods. Laboratory testing showed doors added only 0.05-0.09 seconds to egress— insufficient to affect emergency exit—confirming doors would not impair the tip-over protection Crown claimed justified the open design. ROA.3909-3911, 1746-1748. Dr. Kerrigan's combination of biomechanical theory, peer-reviewed literature, empirical database analysis, and laboratory testing creates a comprehensive scientific foundation exceeding Daubert's requirements.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant Deavrin Sneed respectfully requests that this Court:

1.  **REVERSE** the district court's orders and judgments, including:

    (i)    ROA. 108;

    (ii)   ROA. 2564-2573;

    (iii)  ROA.2574-2602;

    (iv)    ROA.2603-2630;

    (v)    ROA.5249-5251; and

    (vi)    ROA. 5252.

2.    **REMAND** to the United States District Court for the Northern District of Texas with instructions to:

    (i)    reassign the case to a different magistrate;

    (ii)    admit the expert testimony of Robert Bullen, P.E., J.D. and Jason Kerrigan, Ph.D. as reliable under Federal Rule of Evidence 702;

    (iii)    grant Plaintiff leave to supplement summary judgment response with Crown's expert Grisez's deposition testimony;

    (iv)    apply Texas Civil Practice and Remedies Code § 82.008 correctly by recognizing ANSI/ITSDF B56.1 is a standard that does not trigger the statutory presumption; and

    (v)    deny Defendant Crown's Motion for Summary Judgment and proceed to trial on all claims for products liability (design defect, manufacturing defect, failure to warn), ordinary negligence, and gross negligence.

3.    **GRANT** such other and further relief as this Court deems just and proper, including costs and attorney's fees on appeal.

Respectfully Submitted,

**MONTGOMERY LAW, PLLC**

By:/s/ *Sadat Montgomery*
Sadat Montgomery
Texas Bar No. 24079893
Deniz Kilic
Texas Bar No. 22441137
7901 John W. Carpenter Fwy
Dallas, TX 75247
Phone: (214) 720-6090
Facsimile: (877) 669-8520

*Counsel for Plaintiff-Appellant*
*Deavrin Sneed*

## <u>CERTIFICATE OF SERVICE</u>

I, Sadat Montgomery, certify that today, February 18, 2026, a copy of the brief for appellant, a copy of the record excerpts, and the official record in this case, consisting of volume of pleadings (1)-(16) have been properly served.

Respectfully Submitted,

By:/s/ *Sadat Montgomery*
Sadat Montgomery
Texas Bar No. 24079893

**Via certified email, e-service, or mail, to the above-stated address.**

Drew Thomas, Esq.
Hartline Barger, LLP
8750 Central Expressway
Dallas, Texas 75231
***Counsel for Defendant-Appellee***
***Crown Equipment Corporation***

Thomas J. Cullen, Jr., Esq.
Nelson Mullins Riley & Scarborough, LLP
1222 Demonbreun Street
Nashville, TN 37203
***Counsel for Defendant-Appellee***
***Crown Equipment Corporation***

Pryce G. Tucker, Esq.
Schouest, Bamdas, Soshea, Benmaier & Eastham, PLLC
956 Sherry Lane, 20th Floor Dallas, Texas 75225
***Counsel for Defendant-Appellee***
***Crown Equipment Corporation***

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to <u>5TH CIR. R. 32.2.7(c)</u>, undersigned counsel certifies that this brief complies with the type-volume limitations of <u>5TH CIR. R. 32.2.7(b)</u>. Exclusive of the portions exempted by <u>5TH CIR. R. 32.2.7(b)(3)</u>, this brief contains 12,210 words printed in a proportionally spaced typeface. (In the alternative, for briefs prepared in monospaced typeface, you may certify the number of lines of text used.

This brief is printed in a proportionally spaced, serif typeface using Times New Roman 14 point font in text and Times New Roman 12 point font in footnotes produced by Corel WordPerfect 6.1 software. Upon request, undersigned counsel will provide an electronic version of this brief and/or a copy of the word printout to the Court. Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in <u>5TH CIR. R. 32.2.7</u>, may result in the Court's striking this brief and imposing sanctions against the person who signed it.

By:<u>/s/ *Sadat Montgomery*</u>
Sadat Montgomery
Texas Bar No. 24079893